UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLANCA ESTELLA ORELLANA,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN K. MCALEENAN, et al.,<br><br>Defendants. | Case No. 19-cv-05759-DMR<br><br>**ORDER ON DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 18 |

Plaintiff Blanca Estella Orellana filed a first amended complaint seeking review of the denial of her application for naturalization.[1] [Docket No. 17 ("FAC").] Defendants Kevin McAleenan, Acting Secretary of Homeland Security; Kenneth T. Cuccinelli, Acting Director of U.S. Citizenship and Immigration Services; and John Kramar, USCIS District Director move to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6). [Docket Nos. 18 ("Mot."); 21 ("Reply").] Orellana filed a timely opposition. [Docket No. 19 ("Opp.").] This matter is suitable for determination without oral argument. Civil L.R. 7-1(b).

After consideration of the parties' submissions, Defendants' motion to dismiss is granted.

**I.   FACTUAL AND PROCEDURAL BACKGROUND**

Orellana is a native and citizen of El Salvador. FAC ¶ 5. She has resided in the United States since 1990 and has been a lawful permanent resident since February 26, 2003. *Id.* She is married to a U.S. citizen and has four children. *Id.* Currently, Orellana is employed as a nanny and housekeeper in San Francisco and Marin Counties. *Id.*

In 2002, Orellana was employed by Ocadian Care Center ("Ocadian") to provide care for

---

[1] Orellana's initial complaint sought a writ of mandamus to compel Defendants to adjudicate her then-pending naturalization application. [Docket No. 1.] Defendants reviewed and denied the application during the pendency of this case. [Docket No. 9.] Orellana amended her complaint to challenge Defendants' decision on her application.

elderly residents. FAC ¶ 23. On February 3, 2002, while trying to prevent a patient from falling, Orellana injured her neck, right hand, left hand, right foot, and back. FAC ¶ 23; *see also* Docket No. 9-2, Evidentiary Record ("E.R.") at 125. Orellana filed a disability claim with Ocadian, representing that the injuries she sustained from this incident left her unable to work. FAC ¶ 23; E.R. at 125-27. Ocadian accepted the claim, and Orellana began receiving temporary disability payments in February 2002. E.R. at 111. By March 2003, Ocadian had paid Orellana a total of $37,957.64 in connection with her injuries. FAC ¶ 23. Ocadian was later ordered to pay Orellana an additional $42,700.00 through a parallel California Worker's Compensation Appeals Board ("WCAB") case that confirmed that Orellana had sustained serious injuries and required surgery. *Id.* The WCAB payment schedule was set to be completed on December 23, 2004. *Id.* ¶ 24.

Despite claiming that her injuries left her unable to work, Orellana continued to work while receiving payouts on her disability and worker's compensation claims. Between April 2002 and August 2002, Ocadian hired a private investigator who observed Orellana working as a nanny to the Harris Family of San Rafael, California. FAC ¶ 25. The insurance company filed a mandatory report of suspected fraud with the Marin County District Attorney. *Id.* After confirming Orellana's employment with the Harris family, the District Attorney filed a complaint against Orellana, charging her with three criminal counts: (1) "making a false or misleading statement in support of claim, payment of benefit pursuant to a policy of insurance, in violation of section 550(b)(2) of the [California] Penal Code," a felony; (2) "the crime of making a false or fraudulent statement and representation in support of a claim for worker's compensation in violation of section 1871.4 (a)(1) of the Insurance Code," a felony; and (3) "concealment of material fact affecting insurance benefit, in violation of section 550(b)(3) of the [California] Penal Code," a misdemeanor. E.R. at 108-09. The criminal complaint stated that though the three counts were "different," they were "connected in [their] commission with the charge set forth" in Counts 1 and 2. E.R. at 108-09. Orellana entered into a plea agreement, under which Counts 1 and 2 were dropped and, in exchange, Orellana pleaded guilty to Count 3. FAC ¶ 34. She was sentenced to 90 days jail time and three years' probation, and she was ordered to comply with a civil restitution agreement to pay Ocadian $30,000. *Id.* ¶ 10. As a result of Orellana's conviction, Orellana and Ocadian entered into a settlement agreement.

FAC ¶ 11. The settlement agreement contemplated that the $30,000 restitution amount would be credited against the $42,700 award to Orellana in her WCAB case. *Id.* ¶¶ 36-37. At the time of Orellana's conviction, Ocadian reported that it had paid $56,000 towards her temporary disability claim. *Id.* ¶ 26; E.R. at 128. Ocadian also paid $5,146 in legal and investigation fees and $11,609.00 in temporary disability fees.[2] *Id.* ¶ 26.

In late 2016, Orellana applied for naturalization as a United States citizen under 8 U.S.C. § 1427. On January 24, 2018, USCIS denied Orellana's application, finding that her June 2003 conviction under California Penal Code 550(b)(3) constituted an aggravated felony and a crime involving moral turpitude under 8 U.S.C. § 1101(a)(43)(M)(i).[3] E.R. at 1. On February 20, 2018, Orellana filed a request for a hearing before an immigration officer under 8 U.S.C. § 310(c). FAC ¶ 13. The hearing was held on July 18, 2018. [Docket No. 1 ¶ 2.] On September 13, 2019, Orellana filed the current case seeking a writ of mandamus to compel USCIS to adjudicate her petition. *See id.* On October 8, 2019, USCIS issued a decision affirming its decision to deny Orellana's application for naturalization due to her 2003 misdemeanor conviction. *Id.* ¶ 14. Orellana then amended her complaint to challenge USCIS's final determination.

## II.  LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER 12(B)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001))

---

[2] The extent to which the legal and investigation fees overlap with the $56,000 amount is unclear, since Orellana alleges that the fees were "presumably" part of the total. *See* FAC ¶ 26.

[3] Although California classified Orellana's conviction as a misdemeanor, the federal definition of "aggravated felony" applies in a naturalization petition. *See* 8 U.S.C. § 1101(a)(43)(M)(i).

3

(quotation marks omitted). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001), overruled on other grounds by *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

## III. STATUTORY FRAMEWORK

Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, an applicant for naturalization must be a lawfully admitted permanent resident alien, who (1) has continuously resided in the United States for at least five years before filing her naturalization application, (2) has continued to reside in the United States "from the date of the [naturalization] application up to the time of admission to citizenship, and (3) "has been and still is a person of good moral character, attached to the principles of the Constitution of the United States." 8 U.S.C. § 1427(a); 8 C.F.R. § 316.10(b)(ii). An individual is permanently barred from being regarded as a "person of good moral character" if she has been convicted of an aggravated felony. 8 U.S.C. § 1101(a)(43)(M)(i). An "aggravated felony" is an offense that "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." 8 U.S.C. § 1101(a)(43)(M)(i).

"It has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect." *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967). "Doubts should be resolved in favor of the United States and against the claimant." *Id.* The court reviews a denial of naturalization application de novo. 8 U.S.C. §1421(c).

## IV. ANALYSIS

The INA defines an aggravated felony as "an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000."[4] 8 U.S.C. § 1101 (a)(43)(M)(i). The parties

---

[4] This definition is used within both the removal context and in naturalization proceedings. The primary distinction is that, in removal proceedings, the government bears the burden of proving removability by clear and convincing evidence. In contrast, a petitioner seeking naturalization has the burden of showing eligibility for such relief by a preponderance of the evidence. Most cases examining subsection (M)(i) take place within the removal context; however, those cases are

disagree about whether Orellana's conviction under Count 3 constitutes an aggravated felony within the meaning of the INA. Neither party disputes that Orellana was convicted of a crime of fraud; rather, the disagreement centers on whether Ocadian, the victim of Orellana's fraud, suffered a "loss" of over $10,000. Defendants argue that the restitution agreement requiring Orellana to pay Ocadian $30,000 in restitution establishes that the loss suffered by Ocadian exceeded $10,000. Orellana responds that the $30,000 includes losses attributable to Counts 1 and 2, which were dismissed, and that the court should only consider the actual losses to Ocadian based on the conduct underlying Count 3, the count on which she was convicted. She points out that Count 3 was based on her failure to report outside income to Ocadian between February 20, 2002 and August 14, 2002. FAC ¶ 27; *see* E.R. 109. Therefore, Orellana asserts, the total loss to Ocadian as it relates to her conviction for fraud is $5,010.98, which represents the disability payments Ocadian made to Orellana during that time period. *Id.* Orellana submitted evidence relating to the payments she received from Ocadian. *Id.*; *see* E.R. at 133. Orellana argues that since her failure to report outside income is the conduct underlying the sole criminal count which resulted in conviction, only the losses flowing from that specific conduct should be considered for the purposes of calculating Ocadian's "loss." If Orellana's theory holds, then she has not been convicted of an aggravated felony within the meaning of the INA and is eligible for naturalization.

The key precedent examining the monetary threshold in subsection (M)(i) is *Nijhawan v. Holder*, 557 U.S. 29 (2009). In that case, a noncitizen petitioner was convicted by jury of conspiring to commit mail fraud and related crimes. 557 U.S. at 32. The statutes under which he was convicted did not include any specific monetary loss as an element of the crimes, so the jury did not make any findings relating to the losses caused by the petitioner's conduct. *Id.* At sentencing, the petitioner stipulated that the loss exceeded $100 million. *Id.* The court sentenced him to time in prison and ordered him to pay $683 million in restitution. *Id.* The government subsequently sought to remove the petitioner on the basis that he had been convicted of an aggravated felony. *Id.* at 33. The immigration judge ("IJ") found that the petitioner had been convicted of a crime of fraud and deceit

---

applicable here to the extent that their reasoning does not rely on the difference in burden of proof.

5

and relied on the sentencing stipulation and restitution order to find that the loss to the victims exceeded $10,000. *Id.* The Board of Immigration Appeal ("BIA") and Third Circuit both affirmed, and the Supreme Court granted review.

At the time *Nijhawan* was decided, a split in the Circuit courts existed regarding whether the monetary threshold in subsection (M)(i) referred to an element of the statute under which an individual was convicted, or whether it required examination of the "actual loss" suffered by the victim based on the "factual circumstances surrounding commission of the crime on a specific occasion." 557 U.S. at 33. Under the first (or "categorical") approach, the petitioner could not have been convicted of an aggravated felony because the statutes under which he was convicted did not specify any monetary element. The Court declined to apply the categorical approach and held that the monetary threshold in subsection (M)(i) "applies to the specific circumstances surrounding the offender's commission of a fraud and deceit crime on a specific occasion." *Id.* at 41. The Court also rejected the petitioner's suggestion to apply a "modified categorical approach," which would have limited the immigration court, in determining whether the loss involved amounted to at least $10,000, to considering only "charging documents, jury instructions, and any special jury-finding"; "equivalent judge-made findings"; or "written plea documents or the plea colloquy." *Id.* The Court determined that there was nothing unfair about the immigration judge relying on the petitioner's own sentencing stipulation and the court's restitution order, since the petitioner had the opportunity to contest the amount of loss at the sentencing hearing. *See id.* at 42.

Orellana relies on *Nijhawan* for the proposition that a "loss" under subsection (M)(i) must be "tied to the specific counts covered by the conviction." Opp. at 1 (quoting *Nijhawan*, 557 U.S. at 42). She argues that the court should apply that maxim in this case to look beyond the record of Orellana's criminal case, and consider "any admissible evidence" to calculate the quantum of loss caused to the victim by the specific conduct underlying the count of conviction. The evidence she offers in this case is the check payments she received from Ocadian between February 20, 2002 and August 14, 2002, which total less than $10,000. Orellana urges the court to consider the check payments even though they were not part of the criminal record. Her position finds no support in *Nijhawan* or its progeny.

1    First, *Nijhawan* did not say that an IJ may consider "any admissible evidence." It held that
2    the IJ could consider records in the underlying criminal case that could not normally be considered
3    under either a categorical or modified categorical approach, such as sentencing-related material.
4    Allowing a broader examination of the criminal case records makes sense in the context of
5    ascertaining the actual loss suffered by a specific victim. However, *Nijhawan* also noted that "the
6    sole purpose of the aggravated felony inquiry is to ascertain the nature of a prior conviction; it is not
7    an invitation to relitigate the conviction itself." 577 U.S. at 42 (internal quotation marks omitted).
8    Relitigating the conviction is precisely what Orellana proposes. The criminal record does not
9    contain or refer to the check payments Orellana has now submitted for this court's consideration,
10   and nothing indicates that the stakeholders in the criminal case considered that the losses caused by
11   Orellana in Count 3 were limited to disability payments made to her between April and August
12   2002. Therefore, Orellana is in effect seeking to reopen the investigation into a seventeen-year-old
13   conviction with evidence and arguments that do not appear to have been before the criminal court.
14   She has not cited authority, nor has the court identified any, that allows a sweeping investigation
15   into facts beyond the criminal case record. *See, e.g.*, *Chiao Fang Ku v. Attorney Gen. United States
16   of Am.*, 912 F.3d 133, 140 (3d Cir. 2019) ("[W]e have consistently interpreted *Nijhawan* as allowing
17   an IJ, in determining the loss amount, to look beyond the charging document to *sentencing-related
18   materials*." (emphasis added)); *Yepes v. U.S. Atty. Gen.*, 479 F. App'x 320, 324 (11th Cir. 2012)
19   ("Under *Nijhawan*'s circumstance-specific approach, the agency was allowed to consider the record
20   from [the petitioner's] conviction, including the amount of *any restitution order*." (emphasis
21   added)); *Friday v. Attorney Gen. United States*, 750 F. App'x 114, 116 (3d Cir. 2018) ("[C]ourts are
22   not constrained to the modified categorical approach and may look to the *sentencing-related
23   material* in order to determine whether the crime meets the monetary threshold." (emphasis added)
24   (internal quotation marks omitted)).

25   Second, even if the court adopted Orellana's approach, Orellana has not pleaded facts
26   sufficient to show that she was not convicted of a fraud crime in which the loss to the victim exceeds
27   $10,000. She has not, for example, explained what losses resulted from the dismissed counts or
28   how those losses were calculated into the $30,000 restitution agreement. *Yepes* rejected a similar

7

argument:

> Although Bedoya argues that the loss as to his fraud counts was limited to the face amount of the checks, and that any restitution amount in excess was derived from the other counts of conviction, the burden was on Bedoya to explain any discrepancy between the amount related to the two fraud counts and the restitution amount. *See* 8 C.F.R. § 1240.8(d). There is nothing in the record to support Bedoya's conclusion that the amount of restitution in excess of the face amount of the checks necessarily was tied to the other counts of conviction.

*Yepes*, 479 F. App'x at 324. Similarly, in this case, there is no record of the losses tied to the dismissed counts. This raises further doubts that this court can, on review seventeen years later, decide the amount of loss specifically attributable to the count of conviction rather than the dismissed counts.

Third, Orellana's reliance on other caselaw is misplaced. She cites *Friday v. Attorney Gen. United States*, 750 F. App'x 114 (3d Cir. 2018) for the general proposition that "[l]osses arising from acquitted, uncharged, or related conduct may not factor in to the § 1101(a)(4)(M)(i) analysis." 750 F. App'x at 117. *Friday* is distinguishable, for in that case there were records in the underlying criminal matter that clearly delineated between the losses attributable to the counts of conviction and the uncharged conduct. *Id.* Here, there is no indication of what losses were attributable to the dismissed counts or how the overall $30,000 restitution amount was calculated. Orellana also relies on *Singh v. Attorney Gen. of U.S.*, 677 F.3d 503, 513 (3d Cir. 2012), which observed that a federal restitution order entered into pursuant to a party agreement is "not limited to actual losses from the offense of conviction." 677 F.3d at 513. Even if the court accepts that a restitution order obtained by agreement of the parties does not necessarily reflect the actual losses attributable to the count of conviction, it is still Orellana's burden to show that the actual losses did not exceed $10,000. Orellana cites no evidence in the underlying criminal case regarding the division of losses between the three counts, so *Singh* does not shed further light on her position. *Chang v. I.N.S.*, 307 F.3d 1185 (9th Cir. 2002) provides an example of where a court looked beyond a restitution order to find that the losses attributable to the count of conviction were lower than the total amount of restitution ordered. 307 F.3d at 1190-91. However, in that case, the "loss-to-the-victim amount for [the] conviction [was] separately and clearly stated in the plea agreement." *Id.* at 1191. Here, Orellana's

1  plea agreement is not in the record, nor does she allege that the parties stipulated to set the actual
2  loss for Count 3 at less than $10,000.

3  Finally, Orellana's arguments regarding California's *Harvey* waiver are unavailing. In
4  general, when a defendant pleads guilty to a count under the condition that all other counts will be
5  dismissed, there is an "understanding . . . that [she] will suffer no adverse sentencing consequences
6  by reason of the facts underlying, and solely pertaining to, the dismissed count[s]." *People v.*
7  *Harvey*, 25 Cal. 3d 754, 758 (1979). However, a defendant may waive this presumption through a
8  *Harvey* waiver which "permits a sentencing court to consider counts that were dismissed under a
9  plea bargain, as well as facts obtained from the probation report." *Munoz v. McDonald*, Case No.
10 08-cv-2289, 2010 WL 4054096, at *5 (E.D. Cal. Oct. 15, 2010); *see also People v. Moser*, 50 Cal.
11 App. 4th 130, 132-33 (1996) ("A *Harvey* waiver permits a trial court to consider facts underlying
12 dismissed counts in determining the appropriate disposition for the offense of which the defendant
13 was convicted."). Under California Penal Code section 1192.3(b), "if restitution is imposed which
14 is attributable to a count dismissed pursuant to a plea bargain . . . the court shall obtain a waiver
15 pursuant to *People v. Harvey* . . . from the defendant as to the dismissed count." Neither party
16 disputes that Orellana entered into a *Harvey* waiver as a result of her 2003 conviction. E.R. at 102.
17 Orellana asserts that a *Harvey* waiver allows a criminal court to consider losses from dismissed
18 counts in setting a restitution order even though those losses cannot be considered for the purposes
19 of the monetary threshold inquiry in subsection (M)(i). It is unnecessary to decide this issue; even
20 if the court accepted Orellana's position regarding a *Harvey* waiver, as discussed above, she has not
21 pleaded facts sufficient to show that the losses attributable to her count of conviction were less than
22 $10,000.

23 In sum, accepting all of the facts alleged in the complaint as true, the court finds that Orellana
24 has not stated a legally cognizable claim for relief. Her argument relies heavily on an overbroad
25 and unsupported reading of *Nijhawan* that would require the court to reopen a criminal investigation
26 that has been closed for seventeen years. The evidence that the IJ and court can properly consider
27 under *Nijhawan* does not imply, much less establish, that the actual loss attributable to Orellana's
28 count of conviction was less than $10,000. Accordingly, under the facts as pleaded, Orellana cannot

United States District Court
Northern District of California

meet her burden to show that she is eligible for naturalization.

## V.  CONCLUSION

For the foregoing reasons, the government's motion is granted and Orellana's claim is dismissed. While it appears somewhat doubtful that Orellana can amend her pleadings to state a legally sufficient claim for relief, the court cannot say as a matter of law that amendment would be futile. Accordingly, Orellana shall file an amended complaint by no later than May 8, 2020. If she fails to do so, the case will be dismissed.

**IT IS SO ORDERED.**

Dated: April 16, 2020

DONNA M. RYU
United States Magistrate Judge